**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BOSTIC CONSTRUCTION, INC., | ) | Case No. 05-11199 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |

## <u>MEMORANDUM OPINION</u>

This matter came before the Court on February 25, 2010 upon the Motion to Interpret and If Necessary, Enforce This Court's Order Approving Settlement (the "Motion to Interpret"), filed by Jeffrey L. Bostic, Joe E. Bostic, Jr., Melvin E. Morris, and Tyler Morris (the "Movants") on January 21, 2010, and the objection of Yates Construction Co., Inc. ("Yates") and American Mechanical, Inc. ("American") (collectively the "Respondents") to the Motion to Interpret (the "Objection"), filed by the Respondents on February 21, 2010. At the hearing, Christine L. Myatt and Benjamin A. Kahn appeared on behalf of Jeffrey and Joe Bostic, Edwin R. Gatton and Charles M. Ivey, III appeared on behalf of Melvin and Tyler Morris, David F. Meschan and Zeyland G. McKinney, Jr. appeared on behalf of the Respondents, Robert E. Price, Jr. appeared on behalf of the United States Bankruptcy Administrator, and Gerald S. Schafer appeared in his capacity as Chapter 7 Trustee.

The Motion to Interpret requests the Court to interpret its Order of April 25, 2007 (the "Settlement Order"), which approved, over the objection of Yates, the settlement of any claims that the Trustee could assert on behalf of the corporate debtor against the Movants. The Respondents have now sued the Movants in state court. The Movants assert that the state court

1

action maintains causes of action that were settled by the Trustee and may not now be

maintained by the Respondents.  After consideration of the Motion to Interpret, the Objection,

the arguments of counsel, and the relevant law, the Court will interpret the Settlement Order and,

in so doing, will conclude that the Respondents maintain individual causes of action against the

Movants in state court, which are separate from the corporate causes of action settled by the

Trustee.  Therefore, the settlement between the Movants and the Trustee does not prevent the

state court actions from proceeding.

## I.  JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28

U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States

District Court for the Middle District of North Carolina on August 15, 1984.  This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O), which this Court has the

jurisdiction to hear and determine.

## II.  FACTS

On January 17, 2005, an involuntary petition was filed against the above-referenced

debtor (the "Debtor") in the United States Bankruptcy Court for the Middle District of

Tennessee.  On March 29, 2005, the case was transferred to this Court.  On May 2, 2005, an

Order for Relief was entered.

### A.  The Trustee's Complaint

The Trustee conducted an investigation into the Debtor's financial affairs and the events

leading to the Debtor's bankruptcy.  Based on the investigation, the Trustee prepared but did not

file a complaint (the "Trustee's Complaint") against Jeff Bostic and Melvin Morris based on the

following causes of action: (1) breach of fiduciary duty, (2) unjust enrichment, (3) unfair and deceptive trade practices, (4) aiding and abetting and wrongful distribution of limited liability company assets to members, and (5) punitive damages. The Trustee's Complaint made specific allegations that are relevant here. A summary of those allegations follows.

The Debtor was incorporated in 1991 as Bostic Brothers Construction, Inc. and was originally owned by Jeff Bostic and his brother, Joe Bostic. The Debtor was conceived as a construction company focusing on the construction of multi-family housing units. (Trustee Compl. ¶ 7.) The Debtor never maintained construction workers or employees, relying instead upon various sub-contractors to provide the necessary construction materials and services. (Trustee Compl. ¶ 8.) In 1992, Melvin Morris joined the Debtor, undertaking primary responsibility for the day-to-day management of the Debtor's specific construction projects. (Trustee Compl. ¶ 9.) For a number of years, the Debtor operated profitably. The Debtor developed a good reputation for quality, reliability, and efficiency, based in part on the good name and reputation of Jeff Bostic, Joe Bostic, and Melvin Morris and the dedication and expertise of Melvin Morris in overseeing projects and bringing them to completion. (Trustee Compl. ¶ 10.)

In 2000, Bostic Development, LLC, formerly Bostic Brothers Development, LLC ("BDL"), was formed. BDL was owned initially by Jeff Bostic, Joe Bostic, Melvin Morris, Mike Hartnett, and Tyler Morris. The purpose of BDL was to find and develop multi-unit housing projects for a limited liability company (the "LLC"), which would be formed and owned by an outside investor, namely Jeff Bostic, Joe Bostic and Melvin Morris or designees of Melvin Morris. The outside investor would typically contribute real estate or capital to the LLC in

3

exchange for its interest in the LLC, with Jeff Bostic, Joe Bostic, and Melvin Morris making no capital contribution, but often personally guaranteeing the construction loan. (Trustee Compl. ¶ 11.)

During 2000 and 2004, the Debtor transitioned from doing most of its work for unrelated third parties to doing substantially all of its work for LLCs substantially owned and controlled by Jeff Bostic, Joe Bostic, and Melvin Morris or Morris-related entities. Melvin Morris customarily arranged for his interest in the LLC to be owned by members of his immediate family or an entity consisting of members of his immediate family (the "Morris Family Entities"). (Trustee Compl. ¶ 12.) As the Debtor's business grew, Jeff Bostic, Joe Bostic, Melvin Morris, and the Morris Family Entities formed a number of other entities including but not limited to Carolina Apartment Products, Inc. ("CAP"), Carolina Apartment Interiors, LLC ("CAI"), and Carolina Apartment Stairs, LLC ("CAS"). These entities were typically formed with no initial capitalization, and their purpose was to provide materials and, in some cases, labor, to the Debtor for a profit. With respect to customers of CAP, CAI, and CAS, the Debtor represented substantially all of their business. (Trustee Compl. ¶ 13.)

On or about January 1, 2003, Joe Bostic resigned from all offices of the Debtor and BDL. The Debtor redeemed his stock and, following his resignation, Jeff Bostic and Melvin Morris remained as the sole shareholders and directors of the Debtor. Melvin Morris served as president of the Debtor and Jeff Bostic served as vice president. (Trustee Compl. ¶ 14.) At the time of Joe Bostic's resignation, the financial statements of the Debtor indicated a profit in 2002 and that the Debtor had a positive net worth of nearly $3.0 million. (Trustee Compl. ¶ 15.)

During 2003 and 2004, the financial condition of the Debtor deteriorated. During that

4

time, the Debtor entered into a number of construction contracts which proved to be ill-conceived and unprofitable. For the most part these contracts were with LLCs owned in part by Jeff Bostic, Joe Bostic, and the Morris Family Entities. (Trustee Compl. ¶ 16.) During this period, the directors and owners of the Debtor became less concerned with the profitability of the Debtor and more focused on the profitability and value created in the LLCs. Based on an analysis performed by BDL, certain construction projects were projected to generate equity to Jeff Bostic, Joe Bostic, and one of the Morris Family Entities in excess of $35.0 million. (Trustee Compl. ¶ 17.)

Little or no influence was exerted by Jeff Bostic and Melvin Morris to ensure that the contracts between the Debtor and the various LLCs were profitable to the Debtor, the decisions concerning contract terms and pricing being largely deferred to representatives of BDL. In connection with the formation and capitalization of each LLC, budgets were prepared and presented to the respective outside investors and the lenders from which construction loans were to be obtained. These budgets indicated that the investor capital contributions and the proceeds from the construction loans would fully and adequately fund the projects. Although Jeff Bostic and Melvin Morris contributed no capital to the LLCs, they represented that they would provide competent and effective management services to the LLCs, and they represented that the Debtor would be able to construct the projects at the budgeted price. The construction budgets were consistently too low. Consequently, the contracts between the Debtor and the project LLC did not cover construction costs, much less provide for project profitability to the Debtor. (Trustee Compl. ¶ 18.)

As the various construction projects progressed, the Debtor was often required by BDL to

5

provide additional labor and materials without a change order or any of the additional compensation that would normally and naturally flow to the Debtor as a result of such extra services and materials. During both the contract formation stage and the actual contract performance stage, the Debtor's officers and directors did not exercise care to ensure that the Debtor's interests were adequately protected. (Trustee Compl. ¶ 19.)

By the end of 2003, the Debtor's financial condition had greatly worsened. The Debtor's financial statements for the year ending December 31, 2003 reflected insolvency. The Debtor's cash flow was insufficient to meet its obligations as they became due. Consequently, in order to keep the Debtor operationally viable, Jeff Bostic and Melvin Morris infused significant cash into the Debtor. (Trustee Compl. ¶ 20.)

Substantially all of the projects initially undertaken by the Debtor in 2004 were underfunded, in some cases by amounts exceeding $1.0 million. (Trustee Compl. ¶ 21.) Notwithstanding the cash flow infusions by Jeff Bostic and Melvin Morris which, at best, temporarily alleviated the Debtor's cash shortage, the Debtor continued to experience cash flow issues throughout 2004. (Trustee Compl. ¶ 22.) During 2004, the Debtor was actively engaged in numerous projects in which Jeff Bostic and Melvin Morris directly or indirectly controlled the LLC that owned the project. (Trustee Compl. ¶ 23.) As owners and/or managers of the LLCs that contracted with the Debtor, Jeff Bostic and Melvin Morris had a duty of good faith, fairness, and special care to the LLCs, which was in conflict with their obligations to the Debtor and the Debtor's creditors to ensure that the transactions be fairly conceived and fairly implemented. (Trustee Compl. ¶ 24.)

Jeff Bostic and Melvin Morris breached their duty to the Debtor and the Debtor's

6

creditors with respect to a number of contracts in that reasonable care was not undertaken in the contract formation or implementation stage to assure that the costs to be incurred by the Debtor in completion of the project would be adequately funded. As a consequence, substantial losses were incurred by the Debtor. (Trustee Compl. ¶ 25.) Jeff Bostic and Melvin Morris also breached their duty to the Debtor and the Debtor's creditors with respect to the Bostic Development at EIU, LLC, the Bostic Development at Tallahassee, LLC, and the Bostic Development at WKU, LLC projects in that the Debtor was required to guarantee or provide collateral for the repayment of part or all of the construction loans to the LLCs on respective projects. As a result, monies which would have been otherwise available to the Debtor from construction draws for the payment of costs that it was incurring were used as security for the repayment of the LLC loans, which were personally guaranteed by Jeff Bostic and Melvin Morris. (Trustee Compl. ¶ 26.)

In addition to the foregoing, Jeff Bostic and Melvin Morris caused or allowed: (a) the Debtor to contract with LLCs owned or controlled by Jeff Bostic and Melvin Morris on terms advantageous to the LLCs and detrimental to the Debtor and its creditors; (b) the Debtor to perform additional work inside the scope of the original contract with the LLC without executed change orders or agreements with respect to additional compensation; (c) the LLCs to utilize construction draws from their respective lenders for purposes other than payment to the Debtor for work performed; (d) the Debtor, when cash availability was in short supply, to pay payroll and other obligations of entities owned by Jeff Bostic and Melvin Morris including BDL and CAP; (e) payments from permanent loan proceeds attributable to Bostic Development at Lynchburg, LLC to be made to LLC members, including Jeff Bostic and Melvin Morris, while

significant monies remained due to Debtor and Debtor's subcontractors for work performed; (f) a system of management to continue that focused on potential profits to be made at the LLC level while largely ignoring the Debtor's profitability, or lack thereof; (g) the Debtor to contract for services and materials on its own credit, when Jeff Bostic and Melvin Morris knew or should have known that the Debtor would not have sufficient funds to pay for the indebtedness so incurred; (h) the establishment of a scheme whereby other companies, owned in whole or in part by Jeff Bostic and Melvin Morris, such as CAP, CAI, and CAS, would sell the Debtor inventory or services at greater prices than could otherwise be obtained by the Debtor; and (I) BDL to use funds drawn from a construction loan on a particular project to be diverted for the payment of expenses on another LLC project.  (Trustee Compl. ¶ 27.)

The Trustee was also prepared to file a separate complaint against Joe Bostic based on alleged preferential transfers occurring within a year of the Debtor's bankruptcy.

### B.  The Settlement Agreement

After these complaints were prepared, the Trustee engaged in settlement negotiations with Jeff Bostic, Joe Bostic, and Melvin Morris.  An agreement was reached between the Debtor, by and through the Trustee, Jeff Bostic, Joe Bostic, and Melvin Morris (the "Parties"), memorialized in a document entitled Settlement and Release (the "Settlement Agreement"), which states that

> the Trustee has conducted [an] extensive investigation into possible claims arising out of or in any way connected with the matters described in or related in any manner to the Debtor or its former business operations which could be brought against [Jeff Bostic, Joe Bostic, and Melvin Morris], among others, under the Bankruptcy Code and/or applicable state law for the benefit of the Debtor's bankruptcy estate, including, but not limited to, any distributions to [Jeff Bostic, Joe Bostic, and Melvin Morris] from affiliated limited liability companies and other entities (the "Purported Claims").

8

Paragraph 2 of the Settlement Agreement requires Jeff and Joe Bostic to pay the Trustee a total

of $250,000.00, and Melvin Morris to separately pay the Trustee $250,000.00.  Paragraph 3 of

the Settlement Agreement states that

> [u]pon the entry of a Bankruptcy Order approving this Agreement and the payment
> of funds described in paragraph 2 above, the Parties, for themselves and their
> successors, assigns, heirs, relatives, affiliates, subsidiaries, related entities, agents,
> officers, directors, employees and legal representatives, hereby release and forever
> discharge each other and their successors, assigns, heirs, relatives, affiliates,
> subsidiaries, related entities, agents, officers, directors, employees and legal
> representatives, from any and all claims and demands, whether known or unknown,
> which the Parties, have or may have, arising out of or in any way relating to the
> Purported Claims.  The Parties each covenant and agree that they have not assigned,
> transferred, or conveyed in any manner all or any part of their legal claims or legal
> rights against any other Party in connection with the matters described above.  This
> release shall be binding upon each of the Parties and their successors, assigns,
> affiliates, heirs, relatives, subsidiaries, related entities, agents, officers, directors,
> employees and legal representatives and shall inure to the benefit of the other Parties
> and their successors, assigns, heirs, relatives, affiliates, subsidiaries, parents, related
> entities, agents, officers, directors, employees and legal representatives.

On March 20, 2007, the Trustee filed a motion to approve the Settlement Agreement.  On

March 30, 2007, Yates filed an objection to the Trustee's motion.  On April 25, 2007, this Court

entered the Settlement Order, which approved the Settlement Agreement, overruled Yates'

objection, and granted the Trustee's motion.  In so doing, the Court found that the settlement

proposed by the Trustee was fair, reasonable, and in the best interests of the creditors and the

bankruptcy estate.

### C.  The Phillips and Jordan, Inc. Action

On January 18, 2008, Phillips and Jordan, Inc. ("P&J"), an unsecured creditor of the

Debtor, filed a complaint in Graham County Superior Court against Jeff Bostic, Joe Bostic,

Melvin Morris, James Bowman, Tyler Morris, BDL, and Bostic Development at Asheville, LLC,

9

asserting causes of action for fraud and unfair and deceptive trade practices. On March 20, 2008, Jeff and Joe Bostic filed an answer and a motion to dismiss the P&J complaint based upon the argument, among others, that such asserted claims belonged to the Debtor's estate, the claims had been resolved and settled by the Trustee, and the settlement had been approved by the Settlement Order. On March 24, 2008, Melvin and Tyler Morris filed their answer and a motion to dismiss the P&J complaint on the same grounds. On August 19, 2008, the Honorable James Downs entered an order denying the defendants' motions to dismiss without explanation. Thereafter, the case was designated as a mandatory complex business case and transferred to the North Carolina Business Court (the "Business Court").

On January 26, 2009, P&J filed an amended complaint to add a new cause of action for constructive fraud against Jeff Bostic, Joe Bostic, Melvin Morris, and Tyler Morris. On February 19, 2009, the Bostics filed their answer and a motion to dismiss the amended complaint, again arguing that the claims of P&J are barred by the Settlement Order. On February 26, 2009, the Morrises filed their answer and a motion to dismiss on the same grounds. Both the Bostics and the Morrises conceded that the state court's August 19, 2008 order foreclosed any further effort to seek dismissal of P&J's claims for fraud and unfair and deceptive trade practices.

On June 2, 2009, the Honorable Albert Diaz of the Business Court entered a memorandum opinion and order denying both motions to dismiss P&J's claim for constructive fraud. Phillips & Jordan, Inc. v. Bostic, No. 08CVS7, slip op. (N.C. Super. Ct. June 2, 2009) (2009 WL 1548057). The Business Court rejected the Movants' argument that P&J lacks standing to assert a constructive fraud claim against them in their capacity as directors of the

10

Debtor.  Id. at 6.  The Business Court noted that in North Carolina, directors generally owe fiduciary duties to the corporation and not to any individual creditor.  Id. at 4.  As such, usually where a director breaches a fiduciary duty, the action is properly maintained by the corporation, rather than an individual creditor.  Id.  However, in situations amounting to a winding up or dissolution of the corporation, a director's fiduciary obligations extend to creditors of the corporation.  Id.  "Where a creditor can show constructive fraud by a director at a time when the corporation is in declining circumstances and verging on insolvency, or where such facts establish circumstances that amount practically to a dissolution, the claim is one that belongs to the creditor and not the corporation."  Id. (internal citations and quotations omitted).  As to the first contention, the Business Court found that P&J properly alleged a claim for constructive fraud.  Id. at 6.  P&J specifically alleged that the Bostics and the Morrises, while serving as officers and directors of the Debtor, breached their fiduciary duties by causing the corporation to make preferential payments to other creditors and diverting loan funds that otherwise would have been able to pay P&J for its work on the construction project.  Id.  P&J further alleged that the Bostics and the Morrises took these actions when the Debtor was either insolvent or nearly insolvent and under circumstances amounting to a winding up or dissolution of the corporation. Id.  Based on these allegations, the Business Court held that P&J's claim for constructive fraud was founded on injuries peculiar or personal to P&J and not the Debtor corporation.  Id. at 7.  As to the second contention, the Business Court held that since the claim arose from a purported breach of a fiduciary duty owed directly to P&J, it was not part of the bankruptcy estate, and the Trustee did not have the authority to bring or settle the claim.  Id.  The Business Court also rejected the contention that allowing P&J to proceed may negatively impact the Debtor's

bankruptcy case, holding that since the Trustee has settled whatever claims he believed the Debtor could lodge against Jeff Bostic, Joe Bostic, and Melvin Morris, whatever recovery P&J receives for pursuing direct claims against them will have no impact on the Debtor's estate. Id. at 8.

### D.  The Respondents' State Court Actions

On October 19, 2009, American filed a complaint against Jeff Bostic, Joe Bostic, Melvin Morris, Tyler Morris, and Michael Hartnett in Randolph County Superior Court.  The complaint alleged the following causes of action: (1) constructive fraud against Melvin Morris and Jeff Bostic, (2) aiding and abetting constructive fraud against Joe Bostic, Tyler Morris, and Michael Hartnett, and (3) violations of N.C. Gen. Stat. Ch. 75D (The North Carolina Racketeer Influenced and Corrupt Organizations Act) against Jeff Bostic, Joe Bostic, Melvin Morris, Tyler Morris, and Michael Hartnett.  On October 20, 2009, Yates filed an almost identical complaint in Rockingham County Superior Court.  The only substantive differences in the allegations that were made in the two complaints concern the nature and location of the work performed.

Subsequently, the Respondents' cases (the "State Court Cases") were designated as mandatory complex business cases and transferred to the Business Court.  On January 4, 2010, Defendants Jeff Bostic, Melvin Morris, Tyler Morris, and Michael Hartnett filed separate motions to dismiss the State Court Cases.  On January 28, 2010, the Respondents each filed motions to stay proceedings in the State Court Cases based on the Motion to Interpret filed by the Movants in this Court.  On February 1, 2010, the Business Court granted the Respondents' motions, staying both State Court Cases until this Court rules on the Motion to Interpret.

### E.  The Motion to Interpret

On January 21, 2010, the Movants filed the Motion to Interpret that is presently before the Court. The Movants argue that the complaints in the State Court Cases do not allege a separate basis for the existence of a fiduciary relationship other than the general one owed to the corporate Debtor, which properly belongs to the Debtor's bankruptcy estate and can only be asserted by the Trustee. The Respondents filed their Objection, urging the Court to abstain from hearing the matter and asserting that they have alleged personal claims against the Movants that are not property of the estate. This Court heard oral arguments and took the matter under advisement.

## V.  ANALYSIS

### A.  Permissive Abstention Pursuant to 28 U.S.C. § 1334(c)(1)

The Respondents request the Court to abstain from deciding the Motion to Interpret. Generally, a federal court must accept the jurisdiction granted it, and only in very rare occasions is discretionary abstention warranted. In re Butterfield, 339 B.R. 366, 373 (Bankr. E.D. Va. 2004). Permissive abstention is addressed by 28 U.S.C. § 1334(c)(1), which states that "nothing in [§ 1334] prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising until title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1); see also Blanton v. IMN Fin. Corp., 260 B.R. 257, 265 (M.D.N.C. 2001).

Several courts have articulated the factors that a court should consider when determining whether to permissively abstain. See, e.g., L. Ardan Dev. Corp. v. Touhey (In re Newell), 424 B.R. 730, 735-36 (Bankr. E.D.N.C. 2010); Century Forest Prods. v. H.W. Indus., Inc. (In re Century Forest Prods., Inc.), Ch. 11 Case No. 09-10016, Adv. No. 09-2078, slip op. at 2 (Bankr.

13

M.D.N.C. Dec. 15, 2009) (2009 WL 4839704); <u>Mercer's Enters., Inc. v. Seascape at</u>

<u>Wrightsville Beach, LLC (In re Mercer's Enters., Inc.)</u>, 387 B.R. 681, 686 (Bankr. E.D.N.C.

2008).  They are: (1) efficiency in the administration of the debtor's estate; (2) the extent to

which state law issues predominate over bankruptcy issues; (3) whether the issues involve

difficult or unsettled issues of state law; (4) the presence of a related proceeding commenced in

state court; (5) the existence of a jurisdictional basis other than 28 U.S.C. § 1334; (6) the degree

of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance

rather than form of an asserted "core" proceeding; (8) the feasibility of severing state law claims

from core bankruptcy matters to allow judgments to be entered in state courts; (9) the burden of

the bankruptcy court's docket; (10) the likelihood that the commencement of the proceedings in

bankruptcy court involved forum shopping by one of the parties; (11) the existence of a right to a

jury trial; (12) whether non-debtor parties are involved in the proceeding.  <u>Newell</u>, 424 B.R. at

735-36; <u>Century Forest</u>, slip op. at 2; <u>Mercer's Enters.</u>, 387 B.R. at 686.

      With regard to the first factor, hearing the Motion to Interpret will not affect the

administration of the estate since the Trustee has already settled the estate's claims against the

Movants.  As for the second factor, the decision requires consideration of both state law and

federal law issues in circumstances that commonly arise in bankruptcy court.  This factor

strongly favors a decision by this Court.  The third factor considers whether the matter involves

state law issues that are difficult and unsettled, and the issues raised in the State Court Claims

are difficult and somewhat unsettled.  However, the Court does not need to decide them in order

to rule on the Motion to Interpret.  Instead, the Court only needs to determine whether such

claims are personal to the Respondents or whether they are derivative claims that may only be

14

asserted by the Trustee.  Thus, the third factor does not favor abstention.  The State Court Cases have been commenced in the Business Court, but the Business Court has stayed those cases in favor of a decision by this Court, so this factor does not favor abstention.  The fifth and sixth factors are undisputed.  No federal jurisdiction exists other than 28 U.S.C. § 1334.  The State Court Cases are remote from the bankruptcy because their outcome will not affect the estate. These two factors favor abstention.  The seventh factor favors abstention because no "core" proceedings are involved.  The eighth factor is inapplicable because the claims in the State Court Cases are not intertwined with bankruptcy "core" matters.  The ninth factor considers the burden on this Court's docket; it does not favor abstention because the Motion to Interpret is just one motion.  The tenth factor, involving the likelihood that the commencement of the proceedings in bankruptcy court involves forum shopping by one of the parties, favors abstention since it appears that the Movants only filed the Motion to Interpret because they were unhappy with the rulings that they received in various state courts.  Nonetheless, the Debtor's bankruptcy was filed long before the State Court Cases, and it is appropriate for a court to interpret its own orders. The eleventh factor is inapplicable: no party has a right to a jury trial.  The twelfth factor considers whether non-debtor parties are involved in the proceeding.  While the Respondents are non-debtor parties, they are also creditors in the Debtor's bankruptcy, and the Movants are former officers and directors of the Debtor.  No other non-debtor parties are involved.

Based on the analysis stated above, the Court concludes that the factors weigh against voluntary abstention.  While the Court is mindful of the interest of comity with the state courts, it is clear that this Court should hear and determine the Motion to Interpret, especially when it involves an interpretation of its own order and when the state court in question, the Business

15

Court, has stayed its proceedings until this Court has ruled.

### B.  What Standard Should Be Used to Determine the Motion to Interpret?

The procedural posture of this matter is unusual.  The Trustee and the Movants settled the Trustee's claims against the Movants.  Then the Respondents filed the State Court Cases against the Movants.  The Court can find only one other case in which the posture is sufficiently analogous to this one.  See In re Bridge Info. Sys., Inc., 325 B.R. 824 (Bankr. E.D. Mo. 2005), aff'd, 344 B.R. 587 (E.D. Mo. 2006).  In Bridge, the plan administrator for a corporate debtor moved for authority to compromise claims of the estate against a controlling shareholder.  Id. at 829.  Creditors of the debtor had previously sued the shareholder in state court, and they objected to the settlement.  Id.  The bankruptcy court determined that the claims asserted by the creditors in state court belonged to bankruptcy estate.  Id. at 833-35.  The settlement motion was approved, and the bankruptcy court held that the settlement was binding on the creditors.  Id. at 835-36.

Here, the Movants request the Court to determine that the Respondents have no causes of action against them that are separate and apart from the causes of action that the Trustee settled with the Movants.  Such a ruling would extinguish the standing of the Respondents, and the State Court Cases would need to be dismissed.  Therefore, the Motion to Interpret is the functional equivalent of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  A Rule 12(b)(6) standard was used by the Bridge court to determine whether the trustee's compromise in that case eliminated the creditors' state court causes of action.  Id. at 827.  The

16

Court will use the same standard[1] here. For purposes of the Motion to Interpret, the Court will accept as true all of the Respondents' factual allegations and construe them in the light most favorable to the Respondents. Nothing herein shall constitute a conclusion of law or finding of fact with regard to the merits of the Respondents' claims. The Court need not determine whether the Respondents have actually stated claims for relief in the State Court Cases. To decide the Motion to Interpret, the Court need only determine whether those causes of action, as pled, are personal to the Respondents and therefore may be asserted by them, or are derivative and may only be asserted by the Trustee.

### C. Property of the Debtor's Estate Includes the Debtor's Interest in Any Cause of Action That Has Accrued Prior to Bankruptcy

The filing of bankruptcy creates an estate consisting of all the debtor's property, including all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1); Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill, 561 F.3d 377, 386 (5th Cir. 2009); In re Nagle, No. 05-42227, slip op. at 2 (Bankr. D. Md. Dec. 20, 2006) (2006 WL 4458701) ("The filing of a bankruptcy petition creates a bankruptcy estate that is comprised of every interest held by the Debtor on that date in property of any kind.") (citing Nat'l City Bank of Minneapolis v. Lapides (In re Transcolor Corp.), 296 B.R. 343, 353

---

[1]In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them. Edwards v. City of Goldsboro, 178 F.3d 231, 243-44 (4th Cir. 1999). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). In making this determination, the court should accept as true all well-pleaded allegations of the complaint, and construe the complaint in the light most favorable to the nonmoving party. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993), cert. denied, 510 U.S. 1197 (1994).

(Bankr. D. Md. 2003)).  Section 541(a)(1) is interpreted broadly.  <u>Stockstill</u>, 561 F.3d at 386;

<u>Logan v. JKV Real Estate Servs. (In re Bogdan)</u>, 414 F.3d 507, 512 (4th Cir. 2005); <u>Calafiore v.</u>

<u>Werner Enters., Inc.</u>, 418 F. Supp. 2d 795, 797 (D. Md. 2006).  "Property of the estate includes

<u>all</u> of the debtor's interests in any cause of action that has accrued prior to the bankruptcy

petition.  And 'all,' 11 U.S.C. § 541(a)(1), means 'all.'"  <u>Miller v. Pacific Shore Funding</u>, 287

B.R. 47, 50 (D. Md. 2002) (emphasis in original); <u>see</u> <u>Bogdan</u>, 414 F.3d at 512; <u>Calafiore</u>, 418 F.

Supp. 2d at 797; <u>TUG Liquidation, LLC v. Atwood (In re BuildNet, Inc.)</u>, Ch. 11 Case No. 01-

82293, Adv. No. 04-9003, slip op. at 6 (Bankr. M.D.N.C. June 16, 2004) (2004 WL 1534296).

When a corporation files bankruptcy, the bankruptcy estate succeeds to the corporation's

rights against it directors.  James Gadsden, <u>Enforcement of Directors' Fiduciary Duties in the</u>

<u>Vicinity of Insolvency</u>, 24-FEB Am. Bankr. Inst. J. 16, 47 (2005) [hereinafter <u>Enforcement of</u>

<u>Directors' Fiduciary Duties</u>].  When an action is personal to a creditor, however, it is not

property of the estate.  David F. Heroy et al., <u>Fiduciary Duties of Officers and Directors of</u>

<u>Financially Troubled Companies</u>, 906 PLI/Comm 1067, 1098 (2008) [hereinafter <u>Fiduciary</u>

<u>Duties of Officers and Directors</u>].

### **D.  State Law Determines What Causes of Action Belong to the Estate**

State law determines whether a right to sue belongs to the debtor pursuant to Section

541(a) or to the individual creditor.  <u>The Mediators, Inc. v. Manney (In re The Mediators)</u>, 105

F.3d 822, 825 (2d Cir. 1997); <u>Steyr-Daimler-Puch of Am. Corp. v. Pappas</u>, 852 F.2d 132, 135

(4th Cir. 1988).  In order to make this determination, a federal court must interpret state law in

accordance with the highest state court.  <u>Private Mortgage Inv. Servs., Inc. v. Hotel and Club</u>

<u>Assocs., Inc.</u>, 296 F.3d 308, 312 (4th Cir. 2002); <u>Liberty Mut. Ins. Co. v. Triangle Indus., Inc.</u>,

957 F.2d 1153, 1156 (4th Cir. 1992). There is no process to certify an issue to the North

Carolina Supreme Court and obtain an opinion, so it is necessary to predict how that court would

decide an issue of state law. Liner v. DiCresce, 905 F. Supp. 280, 292 (M.D.N.C. 1994).

Where the law is unclear, the federal court must predict how the highest state court would

rule, considering canons of construction, restatements of the law, treatises, recent

pronouncements of general rules of policies, well-considered dicta, and the state's trial court

decisions. Private Mortgage Inv. Servs., 296 F.3d at 312; Liberty Mut. Ins, 957 F.2d at 1156.

Decisions by the state's intermediate appellate court are the next best indicia of what state law is,

although such decisions may be disregarded if the federal court is convinced by other persuasive

data that the state's highest court would decide otherwise. Private Mortgage Inv. Servs., 296

F.3d at 312; Liberty Mut. Ins., 957 F.2d at 1156.

### E. The Fiduciary Duties of Corporate Directors in North Carolina

In North Carolina, the directors of a corporation generally owe a fiduciary duty to the

corporation, and when it is alleged that the directors have breached this duty, only the

corporation may sue, not a creditor or a shareholder. Keener Lumber Co. v. Perry, 560 S.E.2d

817, 822 (N.C. Ct. App. 2002); Norman v. Nash Johnson & Sons' Farms, Inc., 537 S.E.2d 248,

253 (N.C. Ct. App. 2000); Green v. Condra, No. 08CVS6575, slip op. at 7 (N.C. Super. Ct. Aug.

14, 2009) (2009 WL 2488930). The duties of directors are to the corporation they serve and not

to the shareholders, but they are enforceable by an action by the shareholders for the benefit of

the corporation, known as a derivative suit. Silverman v. Miller (In re Silverman), 155 B.R. 362,

372 (Bankr. E.D.N.C. 1993); Enforcement of Directors' Fiduciary Duties, supra, at 47. In North

Carolina, a director is required to discharge his duties as a director (1) in good faith, (2) with the

19

care an ordinarily prudent person in a like position would exercise under similar circumstances, and (3) in a manner he reasonably believes to be in the best interests of the corporation.[2]  N.C. Gen. Stat. § 55-8-30(a); see Green, slip op. at 7.

In North Carolina, directors of a corporation do not owe a fiduciary duty to the creditors of the corporation.  Kaplan v. O.K. Techs., L.L.C., 675 S.E.2d 133, 139 (N.C. Ct. App. 2009); Keener Lumber, 560 S.E.2d at 822; Oberlin Capital, L.P. v. Slavin, 554 S.E.2d 840, 845, 847 (N.C. Ct. App. 2001); Whitley v. Carolina Clinic, Inc., 455 S.E.2d 896, 899 (N.C. Ct. App. 1995).  Thus, when the creditors of an insolvent corporation share an injury based on a common act, only a receiver or trustee has standing to assert the creditors' collective claim against the directors of the corporation.  Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., 187 F.3d 439, 441 (4th Cir. 1999); Angell v. Kelly, 336 F. Supp. 2d 540, 544 (M.D.N.C. 2004); Douglass v. Dawson, 130 S.E. 195, 200 (N.C. 1925); Coble v. Beall, 41 S.E. 793, 794 (N.C. 1902); Governors Club, Inc. v. Governors Club Ltd. P'ship., 567 S.E.2d 781, 786-87 (N.C. Ct. App. 2002).  "A single creditor may not individually maintain a general action against a corporation's directors and officers if that creditor shares that injury common to all creditors and has personally been injured only in an indirect manner."  BuildNet, slip op. at 6.  Thus, where fraud or negligent mismanagement of a corporation's business by its directors has resulted in a loss to the corporation and its creditors generally, the right of action belongs to the corporation, and an action against the directors may be maintained only in the name of the corporation for the benefit of all creditors.  Ford Motor Credit Co. v. Minges, 473 F.2d 918, 921, 922 (4th Cir. 1973)

---

[2]By comparison, under Delaware law directors of a corporation have two principal fiduciary duties: care and undivided loyalty.  Stephen H. Case, Rights of Creditors to Sue Corporate Directors for Breach of Fiduciary Duty in America, C946 ALI-ABA 311, 315 (1994).

(holding that a creditor had no standing to sue directors for deficiencies in payment of wholesale financing when the encumbered equipment was properly sold by the receiver; the court also held that the creditor lacked standing to sue directors for damages due to the failure of the corporation to honor its obligation to repurchase defaulted paper); Bradson Mercantile, Inc. v. Vanderbilt Indus. Contracting Corp., 883 F. Supp. 37, 54 (W.D.N.C. 1995); Gilbert v. Bagley, 492 F. Supp. 714, 734 (M.D.N.C. 1980) (holding that a creditor had no standing to sue a corporation's officers and directors for breach of their fiduciary duty on account of mismanagement); BuildNet, slip op. at 7 (holding that a creditor had no standing to sue a corporation's directors for mismanagement, breach of fiduciary duty, and corporate waste); Underwood v. Stafford, 155 S.E.2d 211, 213 (N.C. 1967); Coble, 41 S.E. at 794.

Although the general rule is that directors of North Carolina corporations do not owe a fiduciary duty to the creditors of the corporation, an exception exists when there are circumstances amounting to a winding up or dissolution of the corporation.  Elmet Techs., Inc. v. Radko, No. 3:07CV402, slip op. at 2 (W.D.N.C. May 13, 2008) (2008 WL 2048503); Angell, 336 F. Supp. 2d at 551; Mitchell v. The Erin Mills Capital Corp. (In re Maxx Race Cards, Inc.), 266 B.R. 74, 78 (Bankr. W.D.N.C. 1998); Keener Lumber, 560 S.E.2d at 825; Oberlin Capital, 554 S.E.2d at 847; Whitley, 455 S.E.2d at 900.  If the directors and officers continue to operate an insolvent corporation only to recover the amounts owed to them, to the detriment of the corporation's other creditors, North Carolina courts equate that to a winding up or dissolution and find that the directors and officers owe a fiduciary duty to creditors.[3]  Maxx Race Cards, 266

---

[3]Commentators are divided on the issue of whether or not the duty of directors actually shifts from the corporation to creditors.  Compare Enforcement of Directors' Fiduciary Duties, supra, at 55-56 (the fiduciary duties of directors do not shift from a corporation to its creditors when the corporation enters the vicinity of insolvency; the fiduciary duties are always owed to

B.R. at 78.  However, no duty is owed to creditors, even if the corporation is balance sheet

insolvent, when the directors and officers are acting in good faith in running the business.  Id. at

78; Keener Lumber, 560 S.E.2d at 825; Whitley, 455 S.E.2d at 899-900.

"Once a director's fiduciary duty to creditors arises, he is generally prohibited from

taking advantage of his intimate knowledge of the corporation's affairs and his position of trust

for his own benefit and to the detriment of the creditors to whom he owes the duty."  Keener

Lumber, 560 S.E.2d at 826; see Lawrence v. UMLIC-Five Corp., No. 06 CVS 20643, slip op. at

6 (N.C. Super. Ct. Sept. 14, 2007) (2007 WL 2917465).

> "Where a creditor of a corporation has sustained an identifiable loss peculiar and
> personal to himself by reason of the fraud or negligent mismanagement of the
> corporation's business by its directors, he has a cause of action against the directors
> for the recovery of his personal loss, which will inure to him personally and not to
> the other creditors of the corporation."

Ford Motor Credit, 473 F.2d at 920-21; see also Bradson Mercantile, 883 F. Supp. at 54; Barger

v. McCoy Hillard & Parks, 488 S.E.2d 215, 219 (N.C. 1997); Underwood, 155 S.E.2d at 213;

Goodwin v. Whitener, 138 S.E.2d 232, 233 (N.C. 1964); Douglass, 130 S.E. at 200.  A claim is

personal only if the creditor itself is harmed and no other creditor has an interest in the claim.

Leonard H. Gerson, American Bankruptcy Institute, 27th Annual Spring Meeting, Class Actions

in Chapter 11 Cases: "Whose Claim Is It: Personal Versus Derative Claims", 010409 ABI-CLE

139 at 2 (2009); see Elmet Techs., slip op. at 3 (noting that in North Carolina, a director is liable

---

the corporation; the shift occurs in the class of parties that can assert the corporation's claim; in a
solvent corporation, the directors' duties are for the benefit of the shareholders; in an insolvent
corporation, the directors' duties are for the benefit of the creditors) and Fiduciary Duties of
Officers and Directors, supra, at 1075-80 (same) with Robert B. Millner, What Does It Mean for
Directors of Financially Troubled Corporations to Have Fiduciary Duties to Creditors?, 9 J.
Bankr. L. & Prac. 201, 206 (2000) ("When a corporation becomes insolvent, 'the fiduciary duty
of directors shifts from the stockholders to the creditors.'") (quoting Fed. Deposit Ins. Corp. v.
Sea Pines Co., 692 F.2d 973, 976-77 (4th Cir. 1982), cert. denied, 461 U.S. 928 (1983)).

to a creditor for fraud, negligent misrepresentation, constructive fraud, and unfair and deceptive trade practices only if the director actually participates in the transactions on which the claims are based); Barger, 488 S.E.2d at 220 (N.C. 1997) (finding that an injury is peculiar or personal to a shareholder if a legal basis exists to support the shareholder's allegations of an individual loss, separate and distinct from any damage suffered by the corporation).

Several courts have construed North Carolina law to allow creditors to assert claims against the directors of a corporation. See Ford Motor Credit, 473 F.2d at 921 (holding that a secured creditor had standing to sue directors to recover losses resulting from a failure of the debtor corporation to account for sales of goods out of trust, and that the creditor had standing to sue directors to recover losses resulting from misrepresentations that retail paper was secured by first liens on goods or from forged or altered retail contracts); Angell, 336 F. Supp. 2d at 547 (holding that a secured creditor had standing to sue directors for misrepresentations to the creditor that the creditor's claims would have priority over all other claims against the corporation to induce the creditor to approve a merger of the corporation with another corporation; the alleged misrepresentations were factually unique to creditor and were not made to other creditors); Bradson Mercantile, 883 F. Supp. at 55 (holding that a creditor had standing to sue a corporation's officers and directors when the officers and directors breached a contract between the creditor and the corporation by misapplying a special trust fund account held by the corporation for the creditor's benefit, which breach injured the creditor individually and caused a loss that was separate and distinct from any damage suffered by the corporation); Minnis v. Sharpe, 162 S.E. 606, 607 (N.C. 1932), rev'd on other grounds, 164 S.E. 625 (N.C. 1932) (holding that a depositor had standing to sue the directors of a bank for accepting a deposit when

23

they knew that the bank was insolvent; the wrong was done to the depositor personally and individually, so he had standing to maintain an action against the bank's directors); see also Gilbert, 492 F. Supp. at 734 (holding that shareholders had individual standing to sue officers and directors for breaching the fiduciary duty owed to them by maintaining the market price of the corporation's shares at artificial levels and in issuing false or misleading financial statements); cf. Buchwald v. The Renco Group, Inc. (In re Magnesium Corp. of Am.), 399 B.R. 722, 760 (Bankr. S.D.N.Y. 2009) (holding that false and deficient statements to investors about a corporation's financial status, causing the investors to purchase bonds based on such information, resulted in claims under Delaware law that belong to the investors and not to the trustee of the bankrupt corporation).

The same conduct by directors may give rise to both derivative and individual claims. Fisher v. Apostolou, 155 F.3d 876, 881 (7th Cir. 1998); Gilbert, 492 F. Supp. at 734; BuildNet, slip op. at 4 ("Lastly, Count III, TUG's claim for breach of fiduciary duty and constructive fraud, appears to fall into both [personal and derivative] categories."). Some courts have stayed the litigation of an individual creditor's personal cause of action when it is similar to the derivative claims that the bankruptcy trustee could assert. See Ruppert Landscaping, 187 F.3d at 441; Fisher, 155 F.3d at 883. But since the Trustee has already settled with the Movants, and the estate has reaped the benefit, there is no need to stay the prosecution of the State Court Cases.

### F.  First Claim: Constructive Fraud Against Melvin Morris and Jeff Bostic

The Respondents' first claim for relief is for constructive fraud. They allege that Melvin Morris and Jeff Bostic had a confidential or fiduciary relationship with them, giving rise to a fiduciary duty, and that Morris and Bostic breached that fiduciary duty, thereby damaging the

24

Respondents and benefitting themselves.

A presumption of fraud arises upon a breach of a confidential or fiduciary relationship. Green, slip op. at 9 (citing Terry v. Terry, 273 S.E.2d 674, 677 (N.C. 1981)). A claim for constructive fraud requires a plaintiff to show that the plaintiff and the defendant were in a relation of trust and confidence that led to and surrounded the consummation of the transaction in which the defendant sought to take advantage of his position of trust and benefit himself to the hurt of the plaintiff. Barger, 488 S.E.2d at 224; Governors Club, 567 S.E.2d at 787-88 (stating that a plaintiff must show a fiduciary duty and a breach of that duty); Keener Lumber, 560 S.E.2d at 823 ("Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty."); Green, slip op. at 8, 13 (same). Constructive fraud differs from actual fraud in that it is based on a confidential relationship rather than a specific misrepresentation. Forbis v. Neal, 649 S.E.2d 382, 388 (N.C. 2007); Barger, 488 S.E.2d at 224.

> A claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud. Rather, this cause of action arises where a confidential or fiduciary relationship exists, which has led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.

Forbis, 649 S.E.2d at 388 (quotations and citations omitted; alteration in original).

A creditor may sue a director of a corporation alleging that the director has committed constructive fraud by breaching his fiduciary duty owed directly to the creditor. BuildNet, slip op. at 7. "If that claim is founded upon injuries peculiar or personal to the individual creditor, it is a claim that belongs to the creditor, not the corporation." Id. In BuildNet, the creditor alleged that (a) directors were in a fiduciary relationship specifically with the creditor, (b) the directors breached their fiduciary duty to the creditor, and (c) the creditor suffered an injury peculiar to

itself.  The court held that the allegations were sufficient to withstand the directors' motion to dismiss.  Id.  The BuildNet court concluded: "In sum, TUG may assert a claim for a specific injury to TUG which is distinct from the action that may be maintained by the Debtor.  TUG has a personal claim if they have been injured and no other claimant or creditor has an interest in the cause."  Id. (citations omitted).

Other courts interpreting North Carolina law have taken the same approach.  In Keener Lumber, 560 S.E.2d at 822-23, the court held that a claim by a creditor against a director alleging that the director committed constructive fraud by breaching his fiduciary duty to the creditor is a claim founded on injuries peculiar or personal to the creditor, and therefore the claim belongs to the creditor, not the corporation.  The plaintiff in Keener Lumber alleged that once Perry Builders became insolvent, Perry, as a director of the corporation, owed the plaintiff, as a creditor of the corporation, a fiduciary duty.  Id. at 823.  The plaintiff further alleged that Perry breached his fiduciary duty specifically to the plaintiff by continuing to purchase lumber from the plaintiff without disclosing the status of Perry Builders and failing to pay all creditors of the same class on a pro rata basis.  Id. at 820-21, 823.  Finally, the plaintiff alleged that such breach constituted constructive fraud and that the plaintiff was damaged as a result.  Id. at 823.

The facts alleged in the State Court Cases are analogous to the facts of Keener Lumber. In their complaints, the Respondents alleged that (1) Jeffrey Bostic and Melvin Morris caused the Debtor to enter into subcontracts with them while the Debtor was operating in such a manner as to constitute "dissolution" or "winding up" of the corporation, thus triggering a fiduciary duty to all creditors  (American Compl. ¶ 93; Yates Compl. ¶ 93); (2) Jeffrey Bostic and Melvin Morris breached their fiduciary duties specifically to Respondents by causing the Debtor to

divert funds to pay the indebtedness of other businesses owned by Jeffrey Bostic and Melvin Morris, rather than pay the debts owed to Respondents (American Compl. ¶¶ 90, 98-99; Yates Compl. ¶¶ 90, 98-99), to use excess loan proceeds obtained by false invoices for their own personal gain (American Compl. ¶¶ 100-01; Yates Compl. ¶¶ 100-01), and to make preferential payments to creditors other than Respondents (American Compl. ¶ 91; Yates Compl. ¶ 91); (3) such breaches of fiduciary duties constitute constructive fraud (American Compl. ¶¶ 99, 103; Yates Compl.¶¶ 99, 103); and (4) Respondents suffered a peculiar and distinct injury as a result (American Compl. ¶¶ 102, 104-06; Yates Compl. ¶¶ 102, 104-06).

In Phillips & Jordan, slip op. at 4, the Business Court, relying on Keener Lumber, held that where a creditor can show constructive fraud by a director at a time that the corporation is in declining circumstances and verging on insolvency or where circumstances amount practically to a dissolution, the claim is one that belongs to the creditor and not the corporation.  The facts in Phillips & Jordan are not only analogous to the present situation, they involved an action by a subcontractor against Jeffrey Bostic and Melvin Morris, among others, based on almost identical allegations, the only difference being the nature and location of the work performed.

Consistent with the holdings of Keener Lumber and Phillips & Jordan, the Court concludes that the Respondents' claims for constructive fraud in the State Court Cases are personal to them and may be pursued by them alone, not the Trustee.

### G.  Second Claim: Aiding and Abetting Constructive Fraud Against Joe Bostic, Tyler Morris, and Michael Hartnett

The Respondents each assert a second claim for relief: they allege that Defendants Tyler Morris, Michael Hartnett, and Joseph Bostic aided and abetted the constructive fraud of Jeffrey Bostic and Melvin Morris.  The Plaintiffs allege that while Defendants Jeffery Bostic and Melvin

27

Morris were operating Bostic Construction in such a manner as to constitute a dissolution or

winding up of the company, Defendants Tyler Morris, Michael Hartnett, and Joseph Bostic

substantially assisted and engaged in activities constituting constructive fraud.

It is not clear that North Carolina recognizes a cause of action for aiding and abetting

constructive fraud.[4]  It is not even clear that North Carolina recognizes a cause of action for

aiding and abetting breach of fiduciary duty.[5]  However, if a cause of action for aiding and

abetting constructive fraud exists, then it is personal to both Yates and American for the same

---

[4]The only case found by the Court that mentions such a cause of action is the unreported Business Court decision of <u>Branch Banking and Trust Co. v. Lighthouse Fin. Corp.</u>, No. 04 CVS 1523, slip op. at 7 (N.C. Super. Ct. July 13, 2005) (2005 WL 1995410).  In that case, the court determined that a longer ten-year statute of limitations governs claims for aiding and abetting a breach of fiduciary duty that arises from constructive fraud.  The court then denied the plaintiff's motion to dismiss a counterclaim for aiding and abetting fiduciary duty because the defendant had stated sufficient facts to preclude judgment on a constructive fraud claim, and the claim for aiding and abetting breach of fiduciary duty arose from the alleged constructive fraud.  The court stated, "[T]o the extent that North Carolina recognizes a cause of action for aiding and abetting breach of fiduciary duty, BB&T's motion to dismiss the counterclaim for aiding and abetting breach of fiduciary duty is denied."  <u>Id.</u>

[5]As the court in <u>Battleground Veterinary Hosp., P.C. v. McGeough</u>, No. 05 CVS 18918, slip op. at 7 (N.C. Super. Ct. Oct. 19, 2007) (2007 WL 3071618), stated, "[i]t remains an open question whether North Carolina law recognizes a claim for aiding and abetting breach of fiduciary duty.  The sole North Carolina appellate decision recognizing such a claim [<u>Blow v. Shaughnessy</u>, 364 S.E.2d 444 (N.C. Ct. App. 1988)] involved allegations of securities fraud, and its federal underpinnings were subsequently overruled by the United States Supreme Court [in <u>Central Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994)]."  Courts that have recognized a claim for aiding and abetting breach of fiduciary duty have relied on the reasoning of <u>Blow</u> for support.  <u>See</u> <u>Ahmed v. Porter</u>, No. 1:09CV101, slip op. at 22 (W.D.N.C. Jun. 23, 2009) (2009 WL 2581615); <u>Ivey v. McDaniel (In re EBW Laser, Inc.)</u>, Ch. 7 Case No. 05-10220, Adv. No. 07-2004, slip op. at 1 (Bankr. M.D.N.C. Apr. 21, 2008) (2008 WL 1805575); <u>Ivey v. Crown Memorial Park, LLC (In re Lee Memory Gardens, Inc.)</u>, 333 B.R. 76, 80 (Bankr. M.D.N.C. 2005); <u>Moseley v. Arth (In re Vendsouth, Inc.)</u>, Ch. 7 Case No. 00-10112, Adv. No. 01-2016, slip op. at 16 (Bankr. M.D.N.C. Oct. 10, 2003) (2003 WL 22399581); <u>Regions Bank v. Reg'l Prop. Dev. Corp.</u>, No. 07CVS12469, slip op. at 5 (N.C. Super. Ct. Apr. 21, 2008) (2008 WL 1836657).  Moreover, the United States District Court for the Western District of North Carolina recently held that "no such cause of action exists in North Carolina." <u>Laws v. Priority Trustee Services of N.C., L.L.C.</u>, 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009).

28

reasons that a claim for constructive fraud is personal to them.

According to the courts that have concluded that North Carolina recognizes a claim for aiding and abetting breach of fiduciary duty, a party asserting such a claim must show: (1) the existence of a breach of fiduciary duty by the primary party; (2) actual knowledge of such violation by the aiding and abetting party; (3) substantial assistance by the aider and abetter in the breach of fiduciary duty by the primary party; and (4) resulting injury and damage to the plaintiff.  EBW Laser, slip op. at 1 (citing Equitable Life Assurance Soc'y of the U.S. v. Am. Bankers Ins. Co. of Fla., No. 88-535-CIV-5-H, 1995 U.S. Dist. LEXIS 10880 at *34 (E.D.N.C. May 12, 1995); Restatement (Second) of Torts § 876 (1979)).  If North Carolina were to recognize a claim for aiding and abetting constructive fraud, then it would likely contain some of the same elements as a claim for aiding and abetting breach of fiduciary duty, with the addition of a confidential or fiduciary relationship of which the defendant has taken advantage to the harm of the plaintiff.  Such a cause of action would necessarily be an individual claim because of the confidential relationship required to maintain the claim.  See The Mediators, 105 F.3d at 825 (aiding and abetting breach of fiduciary duty is an individual claim that creditors may bring against third parties); Magnesium Corp., 399 B.R. at 760 (same).

The Court concludes that the Respondents' claims for aiding and abetting constructive fraud in the State Court Cases, if such causes of action exist at all, are personal to them and may be pursued by them alone, not the Trustee.

### H.  Third Claim: Violations of N.C. Gen. Stat. Ch. 75D (Civil RICO) by Jeffrey Bostic, Joseph Bostic, Melvin Morris, Tyler Morris, and Michael Harnett

Finally, the Respondents have alleged a third claim for relief for violations of Chapter 75D of the North Carolina General Statutes.  Chapter 75D consists of the North Carolina

Racketeer Influenced and Corrupt Organizations Act (the "NC RICO Act"), which is the North Carolina version of the federal RICO Act. The Respondents' third claim for relief alleges that Jeffrey Bostic, Joseph Bostic, Melvin Morris, Tyler Morris, and Michael Harnett violated the NC RICO Act through organized unlawful activity that benefitted the defendants and harmed the Respondents.

One of the goals of NC RICO Act is to "provide compensation to private persons injured by organized unlawful activity." N.C. Gen. Stat. § 75D-2(b); see Puckett v. KPMG, LLP, No. 04CVS11289, slip op. at 5 (N.C. Super. Ct. Nov. 15, 2006) (2006 WL 3325709). The NC RICO Act provides a private right of action, and recovery of treble damages and reasonable attorney's fees, to "[a]ny innocent person who is injured or damaged in his business or property by reason of any violation of G.S. 75D-4 involving a pattern of racketeering activity." N.C. Gen. Stat. § 75D-8(c) (2006). While "racketeering activity" is defined as a violation of one of a host of specified state and federal statutes, regardless of a person's criminal intent, Puckett, slip op. at 3 (citing N.C. Gen. Stat. § 75D-3(b)-(c)), the NC RICO Act limits the definition of what constitutes a "pattern of racketeering activity" for purposes of a private action. A "pattern of racketeering activity" must include at least two acts of "racketeering activity", but at least one act must be something other than mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), or an act involving fraud in the sale of securities. See N.C. Gen. Stat. § 75D-8(c). "While the definition of pattern of racketeering activity under § 75D-3(b) requires only two acts of 'racketeering activity,' this requirement is only a minimum." Delk v. ArvinMeritor, Inc., 179 F. Supp. 2d 615, 628 (W.D.N.C. 2002). "[T]he Plaintiff [must] put forth evidence sufficient to support a finding that the acts of racketeering activity are not 'isolated or unrelated incidents.'"

Id. (citing Kaplan v. Prolife Action League of Greensboro, 475 S.E.2d 247, 251 (N.C. Ct. App.

1996), aff'd, 493 S.E.2d 416 (N.C. 1997)).  "The definition in § 75D-3(b) sets forth the minimum

requirements for finding that a person has engaged in a 'pattern of racketeering activity;'

however, the term 'organized unlawful conduct' better encapsulates what is required to say that

someone has 'engaged' in that 'pattern of unlawful activity.'"  Id.  Moreover,

> [t]he plain language of the statute, coupled with the legislative intent, clearly
> indicates the scope of NC RICO is limited to cases where pecuniary gain is derived
> from organized unlawful activity prohibited under the statute.  Put simply, section
> 75D-2(c) requires the aggrieved party to establish a causal connection between the
> alleged pecuniary gain and defendant's activities which allegedly violate section
> 75D-4.

Kaplan, 475 S.E.2d at 251.

        In summary, to state a claim under the NC RICO Act, (1) an "innocent person" must

allege (2) an injury or damage to his business or property (3) by reason of two or more acts of

organized unlawful activity or conduct, (4) one of which is something other than mail fraud, wire

fraud, or fraud in the sale of securities, (5) that resulted in a pecuniary gain to the defendant.

Paragraphs 127-142 of the American Complaint and paragraphs 128-143 of the Yates Complaint

outline the specific allegations of their NC RICO Act cause of action.  The Complaints allege

fourteen separate violations of N.C. Gen. Stat. Ch. 14, which could constitute a pattern of

racketeering activity, none of which are in the nature of mail or wire fraud or fraud in the sale of

securities.  The Complaints also allege specific violations of all three subsections of N.C. Gen.

Stat. § 75D-4, which allegedly constitute a pattern of racketeering activity.  Finally, the

Complaints allege that the Respondents were injured or damaged in their business or property

and that the Movants benefitted thereby.

        The Court concludes that the Respondents' claims for violations of the NC RICO Act in

31

the State Court Cases are personal to them and may be pursued by them alone, not the Trustee.

## VI.  CONCLUSION

In this ruling, the Court does not find that the Respondents have stated claims for relief or that they have proved their allegations in the State Court Cases.  However, based on the facts and circumstances of this case, the Court finds that the three causes of action brought by the Respondents in the State Court Cases are personal to the Respondents and could not have been brought by the Trustee.  Therefore, these causes of action were not included in the Trustee's settlement with the Movants, and the Respondents have standing to bring them.

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BOSTIC CONSTRUCTION, INC., | ) | Case No. 05-11199 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |

### PARTIES IN INTEREST

| | |
|---|---|
| Bostic Construction, Inc. | Yates Construction Co., Inc. |
| Jeffrey Bostic | American Mechanical, Inc. |
| Joe Bostic | Benjamin A. Kahn, Esq. |
| Melvin Morris | Charles M. Ivey, III, Esq. |
| Tyler Morris | David F. Meschan, Esq. |
| Robert E. Price, Jr., Esq. | Gerald S. Schafer, Esq. |